Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL V

| | | |
|---|---|---|
| HOSPITAL ESPAÑOL AUXILIO MUTUO DE PUERTO RICO, INC.<br><br>Apelante<br><br>v.<br><br>DIAGNOSTIC IMAGING CENTER, P.S.C.; DR. FRANCISCO GÓMEZ GOYTÍA; ET AL.<br><br>Apelada | KLAN202400883 | Apelación Procedente del Tribunal de Primera Instancia, Sala de SAN JUAN<br><br>Caso Núm.:<br>K CD2007-0239<br><br>Sobre:<br>Cobro de Dinero |

Panel integrado por su presidente el Juez Hernández Sánchez, el Juez Bonilla Ortiz y la Jueza Mateu Meléndez.

Mateu Meléndez, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 21 de noviembre de 2024.

El 30 de septiembre del año en curso, el Hospital Español Auxilio Mutuo de Puerto Rico, Inc. (en adelante Hospital o la apelante) presentó ante este Tribunal de Apelaciones una *Apelación Civil*. En esta, recurre de la *Sentencia Parcial y Resolución RPC 36.4*, emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante TPI o foro primario) con fecha del 20 de junio de 2024, y notificada el 25. Por virtud del aludido dictamen, al atender una moción de sentencia sumaria sometida por la apelante, el foro primario desestimó la causa de acción sometida por la parte demandada en reconvención, más denegó el resto de los remedios peticionados en la moción dispositiva.

Estudiado el legajo apelativo, conforme al derecho más adelante consignado, resolvemos **confirmar** la sentencia parcial apelada.

**-I-**

El 2 de marzo de 2007, la apelante sometió Demanda en cobro de dinero contra Diagnostic Imaging Center, PSC, (en adelante Diagnostic);

contra el Dr. Francisco Gómez Goytía (en adelante, Doctor Gómez) y otros. Allí, reclamó que los demandados le adeudaban $1,639,847.71 en concepto de ciertos adelantos y adelantos adicionales acordados por las partes en varios contratos. Al contestar la demanda, los demandados aceptaron unos hechos, negaron la mayoría de estos y reconvinieron. En cuanto a esto último, alegaron vicio en el consentimiento brindado por el Doctor Gómez en ciertas garantías personales, por lo que solicitaron se declarara su nulidad.

Tras varios trámites que no son necesarios detallar, el 2 de septiembre de 2023, el Hospital presentó *Moción Solicitando Sentencia Sumaria*. Allí, aseveró que no existía controversia en cuanto a la existencia de los acuerdos,- incluyendo el acuerdo de pago mediante el cual Diagnostic aceptó la deuda y el Doctor Gómez la garantizó personalmente- ni sobre el contenido de sus cláusulas y condiciones. En virtud de ello, reclamó que el tribunal debía descartar las alegaciones levantadas por los demandados en su contra y dictar sentencia sumaria en la que desestime con perjuicio la *Reconvención*.

De igual manera, peticionó que se declarara Con Lugar la Demanda en cobro de dinero. En cuanto a esto, en su escrito la apelante señaló que era incontrovertido que:

1. El Doctor Gómez, representado en todo momento por su abogado, suscribió en representación de Diagnostic y libre, informada y voluntariamente el Contrato de 2003, Contrato de 2004 y Contrato de 2005;
2. los referidos contratos recogen todos los acuerdos de las partes en cuanto a la forma en que se facturarían los servicios profesionales provistos por Diagnostic en el Hospital;
3. estos, excluyen cualquier representación o cualquier acuerdo, verbal o escrito, que no forme parte de los mismos;
4. ni del Contrato de 2003, Contrato de 2004 y Contrato de 2005 surge obligación por el Hospital de proveer data demográfica a Diagnostic de los pacientes que esta atendía en las inmediaciones de la apelante;
5. ninguno de estos acuerdos garantiza un recobro;
6. el Hospital no ha causado daño a Diagnostic;
7. Diagnostic no tiene derecho a las sumas que reclama;
8. los acuerdos no adolecen de vicio en el consentimiento;

9. que previo al 3 de septiembre de 2004, Diagnostic era el único responsable de la facturación del componente profesional de los servicios que proveía en el Hospital;
10. luego de enero de 2005, Diagnostic advino nuevamente a ser la única responsable de tal facturación;
11. el Hospital asumió este rol del 3 de septiembre de 2004 al 31 de diciembre de 2005;
12. durante el periodo que tuvo a cargo dicha función, Diagnostic debía proveerle al Hospital la información y documentación necesaria;
13. el Hospital no tenía obligación de proveer información sobre data demográfica y mucho menos de garantizar que de proveerla, esta estaba perfecta.[1]

Asimismo, el Hospital propuso 34 hechos sobre los que alegó que, basado en los documentos a los que estos hacían referencia, no existía controversia. En su mayoría, estos establecen la existencia de los acuerdos, reproducen varias de sus cláusulas y se dirigen a delimitar los compromisos del Hospital para con Diagnostic. Con fecha del 25 de enero de 2024, la parte apelada sometió su *Oposición a Solicitud de Sentencia Sumaria*. El 5 de abril de este año, el Hospital replicó la oposición sometida. Atendidos estos escritos, el TPI dictó la sentencia parcial apelada. Allí, encontró que no existía controversia en cuanto a 13 hechos. De estos, destacamos los siguientes:

1. HOSPITAL ESPAÑOL AUXILIO MUTUO DE PUERTO RICO, INC. (HEAMPR) es una corporación doméstica sin fines de lucro que opera una institución hospitalaria denominada HOSPITAL ESPAÑOL AUXILIO MUTIO (el Hospital).

2. DIAGNOSTIC IMAGING CENTER, P.S.C. (Diagnostic) era una corporación profesional doméstica, cancelada al 16 de abril de 2014, cuyo presidente era el DR. FRANCISCO GÓMEZ GOYTÍA.

3. El 14 de noviembre de 2003, HEAMPR y Diagnostic otorgaron tres contratos:

   a. CONTRATO DE SERVICIOS PROFESIONALES SERVICIOS DE ANGIOGRAFÍA DIGITAL (Contrato DSA) "para dirigir y administrar los servicios de Angiografía digital por sustracción (DSA) del Hospital."
   b. CONTRATO DE SERVICIOS PROFESIONALES, SERVICIOS DE RADIOLOGÍA DIAGNÓSTICA Y TOMOGRAFÍA COMPUTADORIZAD[A] (Contrato DTC) "para dirigir y administrar los servicios de radiología diagnóstica convencional y tomografía computadorizada del Departamento de Radiología del Hospital. Por servicios de radiología diagnóstica convencional se entiende, rayos X, Fluoroscopia y sonografía; excluyendo sonomamografías,

---

[1] Véanse págs. TA00094-TA00095 del Apéndice.

mamografías, sonogramas endo-vaginales, y otros procedimientos radiológicos que se realizan en el Centro de Imágenes de la Mujer del Hospital."

c. CONTRATO DE SERVICIOS PROFESIONALES, SERVICIOS DE RESONANCIA MAGNÉTICA (Contrato SRM) "para dirigir y administrar los servicios de resonancia magnética del Hospital."

En adelante nos referimos a los Contratos DSA, DTC y SRM en conjunto como los Contratos de 2003.

4. El 2 de septiembre de 2004, HEAMPR y Diagnostic otorgaron tres contratos.

a. CONTRATO DE SERVICIOS PROFESIONALES, SERVICIOS DE RESONANCIA MAGNÉTICA (Contrato SRM II) "para dirigir y administrar los servicios de resonancia magnética a los pacientes del Hospital."

b. CONTRATO DE SERVICIOS PROFESIONALES SERVICIOS DE ANGIOGRAFÍA DIGITAL (Contrato DSA II) "para dirigir y administrar los servicios de Angiografía digital por sustracción (DSA) a los pacientes del Hospital."

c. CONTRATO DE SERVICIOS PROFESIONALES, SERVICIOS DE RADIOLOGÍA DIAGNÓSTICA Y TOMOGRAFÍA COMPUTADORIZAD[A] (Contrato DTC II) "para dirigir y administrar los servicios de radiología diagnóstica convencional y tomografía computadorizada a los pacientes del Departamento de Radiología del Hospital."

En adelante nos referimos a los Contratos DSA II, DTC II y SRMII en conjunto como los Contratos de 2004.

5. Los contratos de 2003 tenían vigencia de un año. A tenor con los Contratos de 2003, Diagnostic era responsable de:

[…]

6. A tenor con los Contratos de 2003, Diagnostic era la encargada de facturar "el componente profesional de interpretación (incluyendo deducibles) a los planes médicos de los pacientes o al paciente mismo, según proceda." (Excepto que en el caso de los pacientes que fueran miembros del plan de socios de la Sociedad Española de Auxilio Mutuo y Beneficiencia (SEAM), Diagnostic facturaría sus servicios a HEAMPRA.) Por su parte, HEAMPR estaba encargada de facturar el componente técnico o de producción a los planes médicos de los pacientes o al paciente mismo, según proceda."

[…]

7. Los Contratos de 2004 tenían vigencia de tres años. A tenor con los Contratos de 2004, Diagnostic era responsable de:

[…]

10. Para el mes de enero de 2005, HEAMPR y Diagnostic llegaron a un nuevo acuerdo con relación a la facturación de los servicios profesionales que prestaba esta última en el Hospital. Estos acordaron que Diagnostic se haría responsable otra vez completamente de la gestión administrativa de facturación de los servicios profesionales que prestaba; retomando así las

obligaciones de las partes en cuanto a la facturación a los Contratos del 2003.

[…]

12. El 10 de marzo de 2005, HEAMPR, Diagnostic y el Dr. Gómez otorgaron un *Payment Agreement* (el Contrato de 2005). Mediante el Contrato de 2005, las partes reconocían la deuda de Diagnostic a HEAMPR por $2,350,000 por concepto de Adelantos bajo los Contratos de 2004 (la Deuda 2005). Cuya Deuda 2005 devengaría intereses al 3% anualmente y debía ser saldada en diez meses. Como parte de la colateral, Diagnostic debía ceder a HEAMPR cuentas por cobrar a Medicare por la suma de $1,500,000. El Doctor Gómez garantizó solidariamente la Deuda 2005 hasta $1,200,000. El Contrato 2005 proveía para Adelantos Adicionales, los cuales el Dr. Gómez también garantizaba, hasta un máximo agregado de $1,200,000. La garantía del Dr. Gómez se extinguiría una vez cobradas las cuentas de Medicare antes mencionadas.

[…]

13. El balance impago de los Adelantos bajo los Contratos de 2004 y los Additional Advances bajo el Contrato de 2005 asciende a $1,639,847.71, más intereses que al 15 de junio de 2023 ascendían a $1,002,244.39.

De igual forma, el TPI entendió que los asuntos en controversia eran los que a continuación enumeramos:

1. Del balance impago por Diagnostic, cuánto corresponde a la deuda por Adelantos bajo los Contratos de 2004 reconocida por los Demandados el 10 de marzo de 2005, y cuánto corresponde a los Additional Advances bajo el Contrato de 2005.

2. Si, luego del 10 de marzo de 2005, HEAMPR cumplió con su obligación contractual de colaborar "para la solución de problemas de facturación incluyendo, pero sin limitarse a ellos, los relacionados con servicios prestados en sala de emergencias, información para identificar correctamente a pacientes, tales como dirección, identificación de seguros médicos y otros." Y en qué medida.

3. Si, luego del 10 de marzo de 2005, Diagnostic carecía información necesaria de los pacientes para facturar por razones atribuibles a HEAMPR o al municipio o supervisión del personal no-médico por parte de HEAMPR.

4. Si, luego del 10 de marzo de 2005, HEAMPR proveyó el acceso suficiente a los expedientes de pacientes e intercambió información para propósitos de facturación, conforme a los Contratos de 2003.

5. Si Diagnostic cedió a HEAMPR cuentas por cobrar a Medicare líquidas y exigibles ("Other Facility Medicare Receivables") por la suma de $1,500,000.00 y qué ocurrió con el cobro de estas.

Luego de esto, el foro primario dictó sentencia sumaria parcial para desestimar la causa de acción contenida en la Reconvención para anular las

garantías brindadas por el Doctor Gómez. Sin embargo, y en cuanto a lo demás remedios solicitados, el TPI los declaró Sin Lugar. De esta determinación, el Hospital solicitó reconsideración; esta fue denegada mediante *Resolución* del 30 de agosto de 20024. Inconforme aún, la apelante sometió el recurso de epígrafe y señaló la comisión de los siguientes errores:

> Erró el Honorable TPI al no considerar ni atender que los demandados-reconvinientes-apelados no controvirtieron los hechos esenciales y pertinentes presentados por el Auxilio Mutuo en su Moción solicitando sentencia sumaria, conforme a los requisitos procesales establecidos por [la] Regla 36 de Procedimiento Civil y su jurisprudencia interpretativa.

> Erró el Honorable TPI al no considerar ni atender que los demandados-reconvinientes-apelados no presentaron prueba de que el Auxilio Mutuo no haya cooperado ni provisto acceso, y el TPI no consideró evidencia y admisiones clave-incontrovertida por los demandados- que demuestra que los problemas que tuvieron los demandados para facturar y cobrar su componente profesional no se debían a ninguna falta de cooperación del Auxilio Mutuo, pero a los problemas internos de los apelados.

> Erró el Honorable TPI al no dictar Sentencia declarando CON LUGAR la Demanda de cobro de epígrafe, pues ante el hecho de que los demandados-apelados no controvirtieron el balance adeudado, sometido bajo declaración jurada, no existe razón alguna para que el foro *a quo* no condenara a Diagnostic y al Dr. Gómez Goytía al pago de la deuda reclamada en la Demanda.

Atendido el recurso, el 2 de octubre de 2024, emitimos *Resolución* en la que establecimos que la parte apelada tendría hasta el 28 de octubre del mismo año para someter su alegato en oposición. El plazo concedido ha vencido y dicha parte no ha comparecido. Por tanto, damos por sometido el asunto sin el beneficio de su comparecencia y procedemos a resolver.

**-II-**

*A.*

El mecanismo procesal de la sentencia sumaria dispuesto en la Regla 36 de Procedimiento Civil, 32 LPRA, Ap. V., R. 36, permite resolver los asuntos de aquellos litigios que no presentan controversias genuinas de hechos materiales y que, por consiguiente, no ameritan la celebración de un juicio. Cruz Cruz v. Casa Bella Corp., 2024 TSPR 47, 213 DPR _____ al citar a Aponte Valentín et al v. Pfizer Pharm., 208 DPR 263, 277 (2021). Véase,

también Cruz Velez v. CEE, 206 DPR 694 (2021), al citar a Mejías et al. v. Carrasquillo et al., 185 DPR 288 (2012) y otros. Así pues, conforme la discutida regla, procede dictar sentencia sumaria si de las alegaciones, deposiciones y admisiones ofrecidas, más las declaraciones juradas y cualquier otra evidencia presentada se acredita la inexistencia de una controversia real y sustancial sobre algún hecho esencial y material. Deberá, también, justificarse por el derecho aplicable. Id., mencionando a Bobé et al. v. UBS Financial Services, 198 DPR 6 (2017) y demás.

Por otro lado, la parte que se oponga a la moción de sentencia sumaria, deberá así hacerlo dentro del término de veinte (20) días desde su notificación, cumpliendo con los requisitos de ley. Así pues, deberá efectuar una exposición breve de las alegaciones, los asuntos litigiosos o en controversia. También, deberá hacer referencia a los párrafos enumerados por la parte promovente que entiende están en controversia y para cada uno, detallar la evidencia admisible que sostiene su impugnación. Véase, Regla 36.3(b) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(b); Cruz Velez v. CEE; *supra*; y SLG Zapata-Rivera v. J.F. Montalvo, 189 DPR 414, 432 (2013). Las meras afirmaciones no bastan. Meléndez González et al. v. M. Cuebas, 193 DPR 100, 136 (2015). Esto es así, ya que cualquier duda no es suficiente para derrotar una moción de sentencia sumaria, sino que tiene que ser una que permita concluir la existencia de una controversia real y sustancial sobre hechos relevantes y pertinentes. Abrams Rivera v. E.L.A., 178 DPR 914, 932 (2010). No obstante, el no presentarse oposición a una moción de sentencia sumaria no impide que el tribunal falle en contra del promovente de esta ya que esta "puede dictarse a favor o en contra del promovente, según proceda en derecho.". Audiovisual Lang. V. Sist. Est. Natal Hnos., 144 DPR 563, 575 (1997).

Así, al evaluar los méritos de una solicitud de sentencia sumaria un tribunal **podrá** dictar sentencia sumaria si de los documentos sometidos

ante su consideración surge que no existe controversia real sustancial en cuanto a ningún hecho material y solo restaría por resolver una controversia estricta de derecho. Regla 36.3(e) de Procedimiento Civil, 32 LPRA Ap. V R 36.3(e). Por el contrario, no procederá una moción de sentencia sumaria cuando (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han sido refutadas; (3) surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; o (4) como cuestión de derecho, no proceda. Cruz Velez v. CEE; *supra.*

En cuanto a la revisión judicial de una determinación sobre sentencia sumaria, es meritorio señalar que los foros apelativos nos encontramos en la misma posición que el foro primario. Por ello, debemos regirnos por la Regla 36 de Procedimiento Civil y aplicar los criterios de esta. No obstante, no podemos tomar en consideración evidencia que las partes no presentaron ante el TPI. Tampoco podemos adjudicar los hechos materiales en controversia, por ser una tarea que le compete al foro de instancia luego de celebrarse un juicio. Meléndez González et al. v. M. Cuebas, *supra,* pág. 118.

**-III-**

Tal como arriba enunciamos, el Hospital señaló la comisión de 3 errores mediante los cuales, en síntesis, asevera que se equivocó el TPI al no conceder en totalidad su solicitud de sentencia sumaria. Para ello, en primer lugar, la apelante afirma que la parte apelada incumplió con los requisitos de forma que nuestro ordenamiento jurídico le impone a toda parte que se oponga a una moción de sentencia sumaria. Esto, pues en su oposición se limitó a efectuar un resumen de alegaciones generales sobre las que alegó existía controversia sin hacer referencia específica a los párrafos enumerados por el Hospital en su moción dispositiva. Ante el señalado incumplimiento, reclama no se controvirtieron los hechos que propuso en

su solicitud de sentencia sumaria, por lo que catalogó como error el no haberlos aceptado.

De otra parte, al discutir su segundo señalamiento de error, la apelante argumenta que no existía controversia sobre alguno de los asuntos que el foro primario encontró permanecían controvertidos. Específicamente, sobre si luego del 10 de marzo de 2005: el Hospital cumplió con su obligación contractual de colaborar para la solución de problemas de facturación; si Diagnostic carecía de información necesaria de los pacientes para facturar por razones atribuibles al Hospital o al municipio; y si el Hospital proveyó el acceso suficiente a los expedientes de pacientes e intercambió información para propósitos de facturación, conforme a los Contratos de 2003. Según la apelante, no es necesario dilucidar estos hechos, pues lo único a lo que se comprometió fue a trabajar o colaborar con Diagnostic para la solución de problemas de facturación, más no a resolverlos.

Por último, en la discusión de su tercer error, el Hospital afirmó que no existía controversia en cuanto a que, al 15 de junio de 2023, Diagnostic adeudaba la suma de $2,595,516.36. A su vez, argumentó que era innecesario dividir las cuantías adeudadas por Adelantos y *Additional Advances*, pues la parte apelada respondía por ambos conceptos. Específicamente expuso: "En ese sentido, no existía ningún impedimento para que el TPI haya condenado a los apelados al pago de dichas cuantías en la *Sentencia* y a su vez haya declarado Con Lugar la *Demanda* en cobro entablada por el Auxilio Mutuo, además de que se tomó en consideración para propósitos del cálculo del balance de la deuda, en cualquier caso, se trataría de una garantía que no impedía que el Auxilio Mutuo les cobrara la deuda a los apelados directamente. **En ese sentido, eran los apelados quienes estaban obligados a controvertir el balance de la deuda reclamada por el Auxilio Mutuo en su Oposición a la Solicitud de**

**Sentencia Sumaria, y como quedó demostrado no lo hicieron.**" (Énfasis en el original)

Debido a que el dictamen que se apela atiende una moción de sentencia sumaria, según ordena nuestro ordenamiento que hagamos hemos examinado la solicitud de sentencia sumaria del Hospital, así como la oposición que frente a ella interpuso la parte apelada. Efectuado este análisis, encontramos que la apelante cumplió con las disposiciones relativas a la sentencia sumaria arriba citadas. Igual conclusión no podemos alcanzar sobre la oposición sometida por la parte apelada. Como correctamente señala el Hospital, en su oposición se limitó a efectuar un resumen de alegaciones generales sobre las que alegó existía controversia. Ahora bien, como es sabido, este incumplimiento no implica la concesión automática de la sentencia sumaria peticionada, pues este remedio será concedido solamente si procede en derecho.

Así pues, procedemos a sopesar si fue correcta la conclusión alcanzada por el foro primario sobre la existencia de controversias sobre hechos medulares que impidan la resolución sumaria de la polémica de auto. Como ya señalamos, por las razones específicas consignadas antes, la apelante propone que respondamos dicha interrogante en la negativa. No obstante, un estudio del legajo apelativo, nos mueve a concluir que efectivamente existe controversia en cuanto a varios asuntos que impedían la resolución sumaria del cobro de dinero. Los argumentos sometidos por la parte apelante en contrario, se limitan a proponer que muchos de estos hechos no tienen que dilucidarse pues no era su responsabilidad resolver los problemas de facturación de Diagnostic o era innecesario tener que separar las partidas adeudadas. No estamos convencidos de que así sea. Por el contrario, al igual que el foro primario hizo, estimamos que es esencial conocer si el Hospital interfirió o de alguna forma ocasionó que Diagnostic pudiera facturar. Así, y por tal razón, **acogemos como propios los asuntos**

**en controversia identificados por el TPI en las páginas 13 y 14 de su sentencia parcial, según enumerados en la exposición narrativa del tracto procesal de esta *Sentencia*.** Concurrimos que estos hechos impiden la resolución sumaria del cobro de dinero, por lo que resolvemos que ninguno de los errores señalados fue cometido.

**-IV-**

Por las razones antes esbozadas, confirmamos el dictamen apelado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones